**IVETTE AMELBURU MANINGO, ESQ.**
Nevada Bar No. 7076
LAW OFFICES OF IVETTE AMELBURU MANINGO
400 S. 4th Street, Suite 500
Las Vegas, NV 89101
Tele.: (702) 793-4046
Fax: (844) 793-4046
E-mail: iamaningo@iamlawnv.com
*Attorney for Defendant Densmore*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No.: 2:20-cr-00126-APG-VCF |
| v. | |
| RICARDO DENSMORE, | **DEFENDANT DENSMORE'S SENTENCING MEMORANDUM** |
| Defendant. | |

COMES NOW, Defendant RICARDO DENSMORE, by and through his attorney of record, IVETTE AMELBURU MANINGO, ESQ. of the LAW OFFICES OF IVETTE AMELBURU MANINGO, and hereby submits the following SENTENCING MEMORANDUM.

///

///

1

The following Memorandum is offered in addition to any evidence and/or argument adduced at a hearing on this matter. The Defendant respectfully prays that this Honorable Court impose a sentence in accordance with the binding Plea Agreement and the purpose, goals, and factors as set forth in 18 USC § 3553.

DATED this 28th day of July, 2022.

/s/ *Ivette Amelburu Maningo*
IVETTE AMELBURU MANINGO, ESQ.
Nevada Bar Number 7076

2

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. Summary of Case and Recommendations.

On June 4, 2020, the government filed a two-count Complaint charging Tyree Walker, Devarian Haynes and Ricardo Densmore with Conspiracy to Commit Arson (18 U.S.C. § 844(n)) and Arson (18 U.S.C. § 844(i)), alleging that on May 31, 2020, during protests related to the police killing of George Floyd, the codefendants conspired to and in fact maliciously damaged and destroyed, by means of fire and explosive materials, a marked LVMPD Patrol Unit. ECF 1. A four-count Indictment was thereafter filed on June 16, 2020, charging Walker, Haynes, and Densmore with Counts One and Three- Conspiracy to Commit Arson (18 U.S.C. § 844(n)) and Counts Two and Four- Arson (18 U.S.C. § 844(i)). ECF 47. All three defendants have entered into plea agreements with the government under the same terms.

Mr. Densmore's Plea Agreement was filed on March 24, 2022. ECF 166. On that same date, Mr. Densmore appeared before this Court and entered his plea of guilty. ECF 167. Mr. Densmore plead guilty to one count of Civil Disorder in violation of 18 U.S.C. § 231(a)(3), thereby accepting responsibility for the offense. Pursuant to the binding Plea Agreement, the parties recommend a sentence of 24 months imprisonment, 100 hours of community service, a supervised release term of three years, and an assessment/fine of $100.00. ECF 166.

The Presentence Investigation Report ("PSR") was prepared on May 16, 2022. The PSR recognizes that Mr. Densmore's timely plea of guilty, and his factual admissions, provide an adequate basis for a reduction for acceptance of responsibility pursuant to USSG 3E1.1 as recommended by the parties. *See* PSR at p. 8 and 9. Further, the PRS highlights that there are

factors that may warrant a sentence outside of the advisory guideline system. First, Mr. Densmore has a limited criminal history, and the instant offense is his first felony conviction. Further, Mr. Densmore's role in the instant offense was limited, as he filmed the crime being committed while appearing to have been influenced by those around him. *Id. at 18.* Mr. Densmore's upbringing and background, which included a lack of stability and abuse, are mitigating factors also justifying a sentence outside the guidelines. *Id*. The PSR notes that if the Court determines there are no valid grounds for a departure or a sentence outside the guidelines, Mr. Densmore will be given an opportunity to withdraw from the guilty plea. *Id* at p. 16.

In summary, while the guideline imprisonment range is 41 to 51 months based upon a total offense level of 21 and a criminal history category of II *Id. at 16*, the PSR recommends, in accordance with the parties' binding plea agreement, that a downward variance is warranted, and a sentence of 24 months is reasonable and sufficient. *Id.* at 18. Further, the PSR recommends a three-year term of supervised release, no fine (based on Densmore's inability to pay), and a mandatory $100 special assessment. The PSR also sets forth that restitution in the amount of $12,762.50 is due. *Id.* at 18-19.

**II.     Mitigating Information.**

    **a.     *Nature of the Offense.***

These charges arose out of an incident involving the fire damage of an unoccupied police vehicle that occurred at a protest in downtown Las Vegas on May 31, 2020. The local protests were among thousands of protests occurring in the United States and throughout the world after

the killing of George Floyd by law enforcement officers captured on tape in Minnesota. Mr. Densmore, a young African American male, watched along with millions as Floyd was brutally suffocated by police for no apparent reason. Walker, Haynes and Densmore attended the local downtown protests on May 31, 2020. Aside from being affected by the emotions surrounding the killing, Densmore was also under the influence of alcohol and marijuana. While at the protests, Walker and Haynes set an unoccupied Las Vegas Metropolitan Police Department car on fire while Densmore recorded the event and posted it on social media. Densmore, when interviewed by authorities, confessed to his involvement in the incident.

Mr. Densmore is not disputing the violent nature of the incident or minimizing the seriousness of his behavior. However, his actions should continue to be viewed in context, as he was clearly caught up in the intense emotions generated by the brutal killing and his participation in a legitimate protest. Additionally, it is important to point out that no one was injured in any way. Moreover, Densmore's role in this incident was limited. While he did in fact record and post the events on social media, he did not participate in lighting fire to and damaging the unoccupied police vehicle. Lastly, he immediately took responsibility for his role, confessed to the wrongdoing, and has showed remorse. This is an isolated incident that occurred under unique and particularly emotionally charged circumstances.

**b.**     ***Limited Criminal History and Behavior Since Pre-Trial Release.***

As acknowledge by the PSR, Mr. Densmore's criminal history is limited. *See* PSR at p. 18. His only criminal convictions are misdemeanors including traffic citations, a Petit Larceny at age 18, and a misdemeanor charge Battery DV in February 2019 at age 22. While Densmore

realizes this is not the forum to relitigate or justify his behavior related to his Battery DV offense, as he did plead no contest to the charge, it is significant to note that he complied and completed all the responsibilities of that case, satisfying all the requirements ordered by that court during the probation period. Densmore appeared at all his court hearings, obeyed all court orders and case requirement (classes/fines/community service) and was successfully supervised throughout.

Related to this case, Mr. Densmore was released on pretrial supervision over two years ago, on July 1, 2020, and began his supervision through the Eastern District of Michigan under the direct supervision of Pretrial Officer, David Clifford. He remained on house arrest over nine months and had one bump in the road early on (Densmore traveled to Las Vegas and to his attorney's office without obtaining prior authorization from his pretrial officer). However, after he continued to demonstrate compliance and stability over a significantly long period of time, he was removed from house arrest and continued to be in full compliance. In fact, Mr. Densmore was doing very well overall and despite the pandemic, continued to work and be productive.

Unfortunately, on April 25, 2022, Mr. Densmore was arrested in Ann Arbor, Michigan on local charges. Mr. Densmore remained in custody at the Washtenaw County Jail for over a month, but all charges were dismissed, and he was released from custody on June 8, 2022. While the arrest was based on allegations of felony charges involving Assault with a Dangerous Weapon, Carrying Concealed Weapon, and Interfering with Electronic Communications, a search of Mr. Densmore's person and his vehicle revealed no weapon, and none was recovered. An argument with a girl he was dating was blown out of proportion and after authorities investigated the case,

all charges were dismissed. Due to the nature of the allegations, the state authorities and prosecutors would have clearly pursued charges against Mr. Densmore if they found evidence supporting the statements provided by the alleged victim witness and any merit to the case. However, the State dismissed all charges and Mr. Densmore then appeared in the United States District Court in Michigan for potential revocation due to the arrest. The Michigan federal court continued Mr. Densmore's release on pretrial supervision.

Upon the dismissal of all charges and being cleared in both state and federal court, Mr. Densmore thought the matter was behind him and he could move on. He was able to get his job back and immediately was being productive once again. However, because the United States Marshall's office and/or the pretrial supervision office in Las Vegas failed to clear the bench warrant related to the April 25th arrest, Densmore was taken into custody on the way to work on the morning of July 7, 2022. He spent another stressful day in custody and was unable to go to work. Once it was determined that Densmore was arrested in error, he was released from custody. Mr. Densmore once again got his job back and is currently still employed and working. He is still employed through Top Jobs Temporary Employment Agency transporting vehicles and still occasionally works for Door Dash as a delivery driver.

    **c.**    ***Personal History and Characteristics.***

Mr. Densmore is a young, 26-year-old African American man. He has not had an easy life. At the age of six (6), Densmore was removed from his home in Ann Arbor, Michigan and taken to Las Vegas to be placed in a foster home. Unfortunately, this did not make his life much easier. That foster home eventually became his adopted home and Densmore was not afforded

the nourishment, guidance, structure, love and care all children need. In fact, the contrary was true. He was neglected, often going without things that he needed, and was physically and sexually abused. His sister, Asha, also suffered similar circumstances. As Densmore got older, he felt that he was not wanted and was only being used as a pawn for his adoptive mother to obtain excess money from the State. At the age of 16, Densmore could not handle this mistreatment and decided to run away. He lived between friends and girlfriends' homes and eventually in a group home until he was an adult.

These hardships did not stop Mr. Densmore from obtaining his high school diploma, gaining employment, and eventually saving enough money to rent an apartment with his friend. Despite Mr. Densmore's challenging circumstances, he has been able to be productive, maintain stable employment, and support himself. Mr. Densmore obtained his private investigator certificate when he was 18 years old, obtained his OSHA certification in 2019, is a certified secrete shopper, and received his CPR certification. Mr. Densmore was employed at Special Operations Associates, Inc. (SOA) over the course of two (2) to three (3) years, which was verified by Pretrial Services early on in this case. But, in March 2020, during the COVID-19 crisis, Densmore found himself in an unstable situation again when he was laid off from his job with SOA. Densmore was able to locate his biological parents, reconnected with them and extended family, and moved to Detroit, Michigan for a short time to spend time with his birth family who were supportive of him and his situation.

In those two (2) months, Densmore reconnected with his birth mother and began to build a strong, genuine, supportive relationship with his birth father, his father's long-time girlfriend,

Rena McIntyre, his Aunt Evonne Gray, and the rest of his biological family. However, it was time to head back to Las Vegas to begin working again. Unfortunately, shortly thereafter, he was arrested for the instant offense. Ironically however, his release back to Michigan for pre-trial supervision did provide him the opportunity to strengthen the bond he created with his family in Michigan and has given Mr. Densmore the feeling of belonging to a family, which has been rare in his life. Other than his connection with his sister, Asha, he always felt alone.

### d. Current Family Support.

Mr. Densmore did not have much support until this incident. Fortunately, however, the one positive thing that has come out of this incident is that he has been able to build a family bond which has helped him through this ordeal and will also help keep him on track after release. This is supported by the letters written by his family and offered to this Court for consideration. *See* **Exhibit A** – letters of support. Also *See* **Exhibit B**- photos of Mr. Densmore with his paternal biological family; father, grandmother, and aunt. Mr. Densmore has always craved familial support, has finally found it, and does not want to lose it. That is why Mr. Densmore respectfully requests that he be permitted to self-surrender in or near Michigan, where he and his family currently reside, so that he can serve his time with his loved ones relatively close by, leaving his new-found support intact. In that respect, Mr. Densmore requests that this Court recommend a designation to a BOP facility in or near Michigan (Milan FCI in Michigan or Elkton FCI in Ohio).

### III. <u>Legal Argument.</u>

Mr. Densmore submits that a sentence of 24 months imprisonment, 100 hours of community service, a supervised release term of three years, and an assessment/fine of $100.00 is sufficient but not greater than necessary and is requesting that same be imposed in accordance with the joint recommendation of the parties and the recommendation in the PSR.

A.  **18 USC § 3553 Sentencing Factors.**

The Supreme Court has emphasized the need for individualized sentencing based not only on the crime, but on the defendant's particular circumstances. See *Pepper v. U.S.*, 131 S. Ct. 1229 (2011). It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual, and every case as a unique study in the human failings that sometimes mitigate, or sometimes magnify, the crime and punishment to ensue. *Gall v. United States*, 128 S. Ct. 586, 598 (2007), quoting *Koon v. United States* 518 U.S. 81, 113 (1996).

In *United States v. Booker*, 543 U.S. 220 (2005), the Court recognized the importance of considering a multitude of factors and not just the guidelines when imposing sentencing. Booker mandated district courts consideration of the directives set forth in 18 U.S.C. § 3553(a). There, § 3553(a) requires federal courts to, "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."

18 U.S.C. § 3553(a)(2) defines such purposes as:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a) further directs sentencing courts to consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the sentencing range as calculated in Sentencing Guidelines, Sentencing Guidelines policy statements, the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

These factors, which *Booker* held as necessary to a sentencing analysis, create a framework that focuses on the unique situation of the individual sentenced. It is this same notion that has kept the Courts from implementing a hard and fast rule as to the sentencing guidelines. The same notion has motivated defendant histories, psychological evaluations, and educational backgrounds to be required inclusions into a PSR.  Indeed, the *Booker* Court's decision made "the Guidelines effectively advisory, requiring a sentencing court to consider Guidelines ranges, see § 3553(a)(4), *but permitting it to tailor the sentence in light of other statutory concerns, see § 3553(a)." Booker* at 222.

The most central principle of sentencing is that "the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The clause is a guidepost, an overarching principle that directs judges in the appropriate exercise of their sentencing discretion within the sentencing range authorized and consideration of factors prescribed by Congress. See *Booker,* 543 U.S. at 233 ("We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a

statutory range."); see also, e.g., *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (referring to clause as "overarching provision" that, post-Booker, "permits the court to tailor the sentence" to the individual defendant and crime in light of the goals of the Sentencing Reform Act of 1984) (citing *Booker,* 543 U.S. at 245-46); *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir.2008) (referring to sentencing purposes of § 3553(a) as "a tapestry of factors, through which runs the thread of an overarching principle" that is "sometimes referred to as the 'parsimony principle' ") (citing *Kimbrough*, 552 U.S. at 101); *United States v. Borho*, 485 F.3d 904, 912 (6th Cir.2007) ("[T]he guidepost for sentencing decisions post-Booker is the 'parsimony requirement[.]' "); cf. *United States v. Jones*, 460 F.3d 91, 195 (2d Cir.2006) ("Selection of an appropriate amount of punishment inevitably involves some degree of subjectivity that often cannot be precisely explained.").

### B.    Policy Considerations.

It has been found that, in general, "[i]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects." *See Michael Tonry Purposes and Functions of Sentencing, 34 Crime and Just. 1, 28 (2006)*.[1] It is also indicated that: "for many crimes including drug trafficking, […] removing individual offenders does not alter the structural circumstances conducing to the crime. […] [E]ven when one ignores all those considerations, the idea that increased penalties have sizable marginal deterrent effects requires heroic and

---

[1] This conclusion is cited as based upon three National Academy of Science Panels, as well as survey evidence. *See Michael Tonry Purposes and Functions of Sentencing, 34 Crime and Just. 1* at 28-29 for further internal citation.

unrealistic assumptions about "threat communication," the process by which would-be offenders learn that penalty increases have been legislated or are being implemented." *Id* at 29.

Likewise, it has been found that "rehabilitation looks to be a considerably more viable strategy […] than it did during the closing decades of the twentieth" century." *Id* at 33. The author continues:

> "Evidence is accumulating from many sources-individual evaluations, meta-analyses (e.g., Lipsey and Landenberger 2006; Mitchell, MacKenzie, and Wilson 2006), literature reviews (e.g., Gaes et al. 1999; U.S. Surgeon General 2001), and practical experience-that well-managed, well-targeted programs can reduce participants' probability of reoffending. A wide range of programs, including drug treatment, anger management, cognitive-skills programs, sex offender treatment, and various educational- and vocational-skills programs have been shown to reduce reoffending (Gaes et al. 1999). A report from the English Home Office, which underpinned a massive reorganization of the English criminal justice system mandated by the Criminal Justice Act of 2003, concluded that "a reasonable estimate at this stage is that, if the [treatment] programs are developed and applied as intended, to the maximum extent possible, reconviction rates might be reduced by 5-25 percentage points (i.e. from the present level of 56 percent within two years to (perhaps) 40 percent)" (Halliday 2001, p. 7). The most recent meta-analysis of the effects of cognitive-behavioral programs concluded that, on average, they reduced reoffending by 27 percent (Lipsey and Landenberger 2006). The proliferation of drug courts and prisoner reentry programs in the United States bears witness to the widely shared perception that some things work." *Id*.

Applying this research, it is indicated that "rigid sentencing policies obstruct efforts to prevent crime through rehabilitation for offenders." *Id*.

Elsewhere, Congress has seen fit to require the sentencing court to also recognize that: "if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable,

recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). "Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider." *Rita v. U.S.*, 551 U.S. 338, 364-65 (2007)(internal citations omitted).

Judges have recognized that the court itself must determine what factors are relevant at sentencing beyond those contained in the sentencing guidelines: "[i]ndeed, the drafters of the Guidelines regime envisioned an important role for judges in articulating what those factors might be. As judges applied the Guidelines, they were supposed to highlight issues and concerns that the Guidelines had not addressed, in effect, to create a common law of sentencing in the interstices of the Guidelines. […] In short, the drafters understood that fairness in the individual case meant something other than rote application of the Guidelines." *U.S. v. Jaber*, 362 F. Supp. 2d 365, 373 (D. Mass. 2005).

### C. Sentencing Departures or Variances.

"A 'departure' is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves." *United States v. Cruz–Perez,* 567 F.3d 1142, 1146 (9th Cir.2009). A "variance" normally occurs when a judge imposes a sentence that is above or below the properly calculated final sentencing range based on the

application of statutory factors enumerated in 18 U.S.C. § 3553(a).*" United States v. Moschella*, 727 F.3d 888, 893 (9th Cir. 2013).

Departures provide authorized adjustments to a sentencing range within the guideline system. As Congress acknowledged in the Sentencing Reform Act, and the Guidelines Manual itself explicitly states, "it is difficult to prescribe a single set of guidelines that encompasses the broad range of human conduct potentially relevant to a sentencing decision." Ch. 1 Pt. A(1)(4)(b); §5K2.0 comment. (backg'd); 18 U.S.C. § 3553(b). Departures, therefore, perform "an integral function in the sentencing guideline system." §5K2.0 comment. Departures help provide courts with a way to impose an appropriate sentence in exceptional circumstances. They also maintain the statutorily mandated "flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." Id.; 28 U.S.C. § 991(b)(1)(B).

In determining an appropriate sentence, this Court must consider the factors of 18 U.S.C. 3553(a). It may also consult the sentencing guidelines. The Guidelines allow the sentencing court to consider a defendant's mental and emotional conditions, previous employment record, family ties and responsibilities, and community ties. *See* United States Sentencing Commission, *Guidelines Manual* §§ 5H1.3, 5H1.5, 5H1.6 (Nov. 1989). While "not ordinarily relevant in determining whether a sentence should be outside the guidelines," these factors may be relevant and considered by the sentencing court in determining what sentence to impose within the applicable Guideline range, as well as in other aspects of sentencing. *See id.* § 5H1.3 ("Mental and emotional conditions,

whether mitigating or aggravating, may be relevant in determining the length and conditions of probation or supervised release."); *id.* § 5H1.5 (employment record relevant when sentencing options available and when determining length and conditions of supervision); *id.* § 5H1.6 (family ties and responsibilities relevant when imposing restitution or fines and when determining length and conditions of supervision). *U.S. v. Brady*, 895 F.2d 538, 543 (9th Cir. 1990).

### D.     The Appropriate Sentence for Ricardo Densmore.

Mr. Densmore has made mistakes, but they do not reflect his innermost character, a young man who is working hard and wants desperately to move on from these mistakes and build a productive and fulfilling life.  Mr. Densmore immediately took responsibility for his conduct in this case by admitting his role when interviewed by police and he then formally took responsibility when he timely plead guilty.  These facts provide an adequate basis for a reduction for acceptance of responsibility pursuant to USSG 3E1.1 as recommended by the parties and the PSR.  Further, while the guideline imprisonment range is 41 to 51 months (based upon a total offense level of 21 and a criminal history category II), a downward variance from the guideline range is warranted and appropriate given Densmore's history and characteristics and said variance is consistent with the goals of sentencing under the factors of 18 U.S.C. 3553(a).  A sentence outside the guidelines is also justified because Mr. Densmore has a limited criminal history, and the instant offense is his first felony conviction.  Further, Mr. Densmore's role in the instant offense was limited as he filmed the crime being committed while appearing to have been influenced by those around him.  Moreover, Mr. Densmore's upbringing and

background, which included a lack of stability and abuse, are mitigating factors also justifying a sentence outside the guidelines.

The parties have jointly recommended and the PSR supports a sentence of 24 months imprisonment, 100 hours of community service, a supervised release term of three years, and an assessment/fine of $100.00. Said sentence is reasonable and sufficient but not greater than necessary and Mr. Densmore is requesting that this Court follow said recommendations when imposing his sentence.

Mr. Densmore fully understands the magnitude of his crime and the impact it has had on the system and his family. He deeply regrets his choices, has learned from his mistakes, and is determined to be a better person moving forward. His acknowledgment of his wrongdoing, combined with his limited criminal history and his conduct since being on supervised supervision, despite minor issues, shows that he is a low risk of recidivism.

## **CONCLUSION**

Mr. Densmore respectfully prays that this Honorable Court impose a sentence of 24 months imprisonment, 100 hours of community service, a supervised release term of three years, and an assessment/fine of $100.00. This sentence has been jointly recommended by the parties to this case and is supported by the recommendation in the PSR. Moreover, said

///

///

///

sentence is sufficient but not greater than necessary and satisfy the purpose, goals, and factors as set forth in 18 USC § 3553.  Further, Mr. Densmore requests that the Court allow him to self-surrender and recommend BOP designation to Milan FCI in Michigan (first choice) and Elkton FCI in Ohio (second choice).

DATED this 28th day of July, 2022.

*/s/ Ivette Amelburu Maningo*
IVETTE AMELBURU MANINGO, ESQ.
Nevada Bar Number 7076

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above SENTENCING MEMORANDUM, was served upon all parties registered to this action to receive electronic service through the court's electronic filing and service system.

DATED this 28th day of July, 2022.

*/s/Wildalia Coulson*
An Employee Of:
IVETTE AMELBURU MANINGO, ESQ.
Nevada Bar Number 7076